# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. _____

**Jordan Branch,**

      Plaintiff,

**v.**

**FinishMaster, Inc.,**
**an Indiana Corporation,**

      Defendant.

## COMPLAINT

COMES NOW Plaintiff, Jordan Branch, and for his Complaint against the Defendant, FinishMaster, Inc. ("FinishMaster"), and alleges the following:

### Introduction

1. This is a proceeding for reinstatement and damages to redress violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and for promissory estoppel and negligent misrepresentation under the Colorado common law.

2. Mr. Branch alleges that FinishMaster discriminated against him in violation of the ADA by terminating his employment following his use of medical leave rather than reassigning him to a vacant position for which he was qualified.

### Jurisdiction

3. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

**Venue**

4. The unlawful employment actions described below were committed in the state of Colorado.

5. Venue is proper in the United States District Court for the District of Colorado under 28 U.S.C. § 1391(b).

**Parties**

6. FinishMaster is an Indiana corporation doing business in good standing in the state of Colorado.

7. FinishMaster is engaged in the wholesale, and retail sale, of aftermarket paints, materials, and accessories for use in the automotive paint and collision repair business.

8. FinishMaster employs approximately 1,900 workers nationwide.

9. Jordan Branch is a natural person residing in El Paso County, Colorado.

10. Mr. Branch is a former employee of FinishMaster.

11. Mr. Branch held several different positions with FinishMaster over the course of his employment.

12. Mr. Branch began his employment with FinishMaster on July 17, 2012 as a Driver ("DSR").

13. Mr. Branch later worked for FinishMaster as a Customer Service Representative ("CSR").

14. Mr. Branch also worked for FinishMaster as an Assistant Manager.

15. FinishMaster eventually promoted Mr. Branch to the Branch Manager Position at the FinishMaster store in Sheridan, Colorado.

16.     At all times relevant to the Complaint, Mr. Branch lived and worked in Colorado.

## General Allegations

17.     All previous allegations are incorporated herein.

18.     On or about August 5, 2017, Mr. Branch shattered his collar bone, and suffered related physical injuries, in a serious ATV accident.

19.     At the time of the accident, Mr. Branch was working for FinishMaster as the Branch Manager of its Sheridan, Colorado store.

20.     After several courses of treatment, Mr. Branch's physicians determined that he needed to undergo orthopedic surgery to repair his collarbone.

21.     Although Mr. Branch did not qualify for FMLA leave due to the number of employees in his area, FinishMaster offers non-FMLA medical leave to full time employees who have been continuously employed with FinishMaster for six months.

22.     To begin the non-FMLA leave process under FinishMaster's policy, employees must submit a request for leave

23.     On April 26, 2018, Mr. Branch requested medical leave for his surgery and recovery.

24.     FinishMaster formally approved Mr. Branch's request for medical leave on April 30, 2018.

25.     On May 7, 2018, Mr. Branch provided an FMLA certification, completed by his orthopedic surgeon, stating that he would be unable to lift with his right arm for six to twelve weeks after his surgery.

26.     The certification also stated that Mr. Branch would be incapacitated from May 11, 2018 through August 3, 2018.

27. Mr. Branch underwent his first surgery on May 11, 2018.

28. On June 1, 2018, FinishMaster placed Mr. Branch on a non-FMLA medical leave of absence beginning May 11, 2018, with an expected return to work date of July 9, 2018.

29. FinishMaster's Non-FMLA medical leave policy states that, "Upon returning from leave, you will be returned to the same or an equivalent position in respect to pay, benefits, and other terms and conditions of employment."

30. Following his surgery, Mr. Branch sent a series of emails to FinishMaster keeping them updated on his recovery and expected return to work.

31. On June 7, 2018, Mr. Branch informed FinishMaster that he was having complications in his recovery and was experiencing "pretty bad nerve pain through my neck."

32. On June 11, 2018, Mr. Branch informed FinishMaster that the plate his doctor inserted during surgery was coming loose and needed to be removed in a second surgery.

33. On July 2, 2018, Mr. Branch informed FinishMaster that due to the complications and severe nerve pain he was suffering, that his doctor recommended that he stay on leave until September 4, 2018.

34. On July 31, 2018, Mr. Branch informed FinishMaster that he was undergoing a second surgery on August 3, 2018.

35. FinishMaster kept Mr. Branch on non-FMLA medical leave for his second surgery.

36. On August 3, 2018, Mr. Branch underwent a second surgery to remove the plate inserted during his first surgery and to repair his collarbone.

37. On August 6, 2018, after his surgery, Mr. Branch informed FinishMaster that his shoulder was in worse shape than his surgeon expected.

38. On August 14, 2018, Mr. Branch's physician told FinishMaster that he would not be able to return to work until October 1, 2018 and that until that time he could not lift or bear weight with his "upper right extremity."

39. On August 24, 2018, FinishMaster filled the Branch Manager position at the Sheridan, Colorado location.

40. FinishMaster informed Mr. Branch that it had filled his Branch Manager position via a letter dated August 24, 2018.

41. The August 24, 2018 letter from FinishMaster to Mr. Branch stated that, "[U]pon your return to work (as confirmed by your physician), we will make our best efforts to find you a suitable position."

42. On September 4, 2018, after FinishMaster filled his Branch Manager position, Mr. Branch informed them he needed a third surgery to repair a re-fracture, nerve pain, and loss of motion in his arm that resulted from a bone pressing on his nerves.

43. On September 17, 2018, Mr. Branch informed FinishMaster that he had discussed the removal of his entire collarbone with his surgeon.

44. On October 2, 2018, Mr. Branch informed FinishMaster about his attempts to get a third surgery scheduled and the fact that his arm "is swelling and going numb and shooting pain through it."

45. FinishMaster kept Mr. Branch on non-FMLA medical leave for his third surgery.

46. On October 23, 2018, Mr. Branch underwent his third surgery, which required a bone graft, two plates, and sixteen screws.

47. On November 19, 2018, Mr. Branch informed FinishMaster that he had started physical

therapy and his doctor informed him that he might be returned to work in January, 2019 "with limitations."

48.    On December 18, 2018, Mr. Branch informed FinishMaster that his bone graft was "weak and brittle still."

49.    On January 14, 2019, Mr. Branch informed FinishMaster that he had a doctor's appointment the following week and would let them know when his doctor thought he could return to work.

50.    On January 28, 2019, Mr. Branch informed FinishMaster that his doctor expected him to return to work on March 11, 2019.

51.    On March 4, 2019, Mr. Branch informed FinishMaster that he had been cleared to return to work.

52.    On that same date, Mr. Branch sent another email to FinishMaster stating that, "[E]verything has healed perfectly. I talked to my doctors PA (physician assistant) about my return to work, she believes I should be able to return to work with no restrictions."

53.    Mr. Branch also informed FinishMaster that his doctor was filling out the FinishMaster fitness for duty form and would be sending it to FinishMaster directly.

54.    Mr. Branch closed his email by stating that, "I am looking forward to getting back to work it has been too long.  If you guys could setup a time to talk that would be great I have a couple of finish appointments and don't want to miss your call.  Please let me know if you guys have any questions at all.  Thanks again."

55.    On March 4, 2019, Mr. Branch's physicians completed FinishMaster's Fitness for Duty/Return From Leave form.

56. The completed Fitness for Duty/Return From Leave form stated that "the employee is fully released and fit for duty, without restriction."

57. The completed Fitness for Duty/Return From Leave form also states that Mr. Branch has "no restrictions" and "may return to work full duty."

58. Mr. Branch's physician faxed the form to FinishMaster on March 4, 2019.

59. FinishMaster received Mr. Branch's completed Fitness for Duty/Return From Leave form on the morning of March 4, 2019.

60. In response to Mr. Branch's March 4 email, FinishMaster then scheduled a phone call between him and Human Resources for Thursday, March 7, 2019.

61. At the time he was cleared to return to work on March 4, 2019, Mr. Branch was still on non-FMLA medical leave with FinishMaster.

62. During the March 7, 2019 phone call, Mr. Branch spoke to Ms. Goldbach (Human Resources), Ms. Campbell (Benefits), and Tracy Scott (Manager).

63. During that call, FinishMaster acknowledged that Mr. Branch was able to return to work.

64. FinishMaster also confirmed that Mr. Branch was eligible for rehire, and that he did not have any performance issues that were preventing him from continued employment.

65. FinishMaster also acknowledged that it had open positions in the Denver area.

66. Even so, FinishMaster told Mr. Branch that his employment would be terminated and that he would need to apply for any opening.

67. On March 7, 2019, FinishMaster confirmed the termination of Mr. Branch's employment in a letter sent to Mr. Branch on that date.

68. The letter states that, "Due to the length of time you have been on leave, our business

needs require that we set a date to separate your employment with the company."

69. The letter further states that, "In order to provide you with adequate notice, your separation date will be effective March 8, 2019."

70. Finally, the termination letter states that, "Should you fully recover and are able to return to the workforce, we invite you to re-apply with FinishMaster."

71. As of March 7, 2019, FinishMaster had at least three open positions in the Denver area: a CSR position, a DSR position, and an Assistant Manager position.

72. During his employment with FinishMaster, Mr. Branch had successfully worked in all three positions before he was promoted to the Branch Manager position in Sheridan, Colorado.

73. As of March 7, 2019, Mr. Branch was fully qualified for all three positions.

74. FinishMaster did not assign Mr. Branch to any of the open positions after he was cleared to return to work on March 4, 2019.

75. On March 8, 2019, FinishMaster terminated Mr. Branch's employment.

**First Cause of Action**
**(Americans with Disabilities Act – Failure to Accommodate)**

76. Plaintiff realleges all prior paragraphs and incorporates them herein.

77. FinishMaster qualifies an employer under the ADA pursuant to 42 U.S.C. § 12111(5)(a).

78. Mr. Branch is a qualified individual with a disability within the meaning of the ADA.

79. At all time relevant to this complaint, Mr. Branch suffered from a physical impairment.

80. Mr. Branch's physical impairment resulted in substantial limitations to his major life activities as compared to members of the general population, including, but not limited to, neurological functions, lifting, and sleeping.

81. Mr. Branch had the required skill, experience, education, and other job related

requirements to work for FinishMaster as a Branch Manager, Assistant Manager, CSR, and DSR.

82. As of March 4, 2019, Mr. Branch could perform all essential functions of the Branch Manager, Assistant Manager, CSR, and DSR positions.

83. At all relevant times, FinishMaster knew of Mr. Branch's physical impairments, their resulting limitations, and Mr. Branch's course of medical treatment.

84. Mr. Branch requested medical leave as a reasonable accommodation.

85. FinishMaster approved Mr. Branch's request for medical leave.

86. Mr. Branch intended to return to work with FinishMaster when his physicians medically cleared him.

87. Mr. Branch's physicians cleared him to return to work on March 4, 2019.

88. On March 4, 2019, Mr. Branch was still employed with FinishMaster.

89. On March 4, 2019, Mr. Branch told FinishMaster of his desire to return to work with the company.

90. On March 4, 2019, FinishMaster could not return Mr. Branch to his prior Branch Manager position because FinishMaster had filled it in August, 2018.

91. On March 4, 2019, FinishMaster had at least three open positions in the Denver area for which Mr. Branch was qualified.

92. FinishMaster did not engage in an interactive process intended to return Mr. Branch to work after he informed them that he was medically cleared to return to work and desired to do so.

93. FinishMaster did not reassign Mr. Branch to any of the vacant positions for which he was qualified after he informed them that he was medically cleared to return to work and desired to

do so.

94. On March 8, 2019, FinishMaster terminated Mr. Branch's employment.

95. After FinishMaster terminated Mr. Branch's employment rather than reinstate him to a vacant position, Mr. Branch suffered substantial harm due to the loss of his employment, including the loss of wages and benefits.

96. Defendant's acts and omissions violated Plaintiff's rights under the Americans with Disabilities Act, 42 U.S.C. § 12112.

### Second Cause of Action – Promissory Estoppel

97. Plaintiff realleges all prior paragraphs and incorporates them herein.

98. FinishMaster told Mr. Branch that it would reinstate him to the same, or an equivalent, position following his medical leave.

99. FinishMaster approved Mr. Branch for leave under its non-FMLA medical leave policy beginning on May 11, 2018.

100. FinishMaster's non-FMLA medical leave policy states that, "Upon returning from leave, you will be returned to the same or an equivalent position in respect to pay, benefits, and other terms and conditions of employment."

101. On August 24, 2018, FinishMaster told Mr. Branch that, "[U]pon your return to work (as confirmed by your physician), we will make our best efforts to find you a suitable position."

102. FinishMaster should have reasonably expected that Mr. Branch would rely upon these representations when evaluating his options for employment during, and after, his medical leave.

103. Mr. Branch relied upon these representations to his detriment by foregoing replacement employment with another company after FinishMaster filled his Branch Manager position on

August 24, 2018.

104. FinishMaster did not return Mr. Branch to an equivalent position, or make any attempt to do so, after he was medically cleared to return to work on March 4, 2019.

105. Instead, FinishMaster terminated Mr. Branch's employment on March 8, 2019.

106. As Mr. Branch was financially harmed by his detrimental reliance on FinishMaster's promise of reinstatement, the Court must enforce it in order to avoid injustice.

### Third Cause of Action – Negligent Misrepresentation

107. Plaintiff realleges all prior paragraphs and incorporates them herein.

108. In the course of its business, FinishMaster represented to Mr. Branch that it would reinstate him to the same, or an equivalent, position following his medical leave.

109. FinishMaster made that representation to Mr. Branch for his guidance in evaluating his options for employment during, and after, his medical leave.

110. FinishMaster knew, or should have known, that Mr. Branch had relied upon these representations due to Mr. Branch updating FinishMaster about when he would be cleared to return to work, including after his Branch Manager position had been filled.

111. Mr. Branch justifiably relied upon that representation by not searching for other employment during the course of his medical leave.

112. Mr. Branch's reliance upon that representation resulted in substantial financial and emotional harm when FinishMaster failed to reinstate him, in spite of having multiple open positions, after almost ten months of medical leave.

### Prayer for Relief

WHEREFORE, Plaintiff prays for the following relief:

a. Nominal damages;

b. Reinstatement and back pay, including loss of benefits and seniority, or front pay in lieu of reinstatement;

c. Nonpecuniary and compensatory damages, including damages for emotional distress and consequential damages;

d. Pre- and post-judgment interest at the highest rate allowed by law;

e. Costs and reasonable attorney's fees; and

f. All other legal or equitable relief to which Plaintiff is entitled.

## Jury Demand

**Plaintiff requests this matter be tried by a jury.**

Respectfully submitted this 16th day of December, 2019.

> CORNISH & DELL'OLIO, P.C.
>
> s/Ian D. Kalmanowitz
> Ian D. Kalmanowitz, # 32379
> Bradley J. Sherman, # 39452
> Cornish & Dell'Olio, P.C.
> 431 N. Cascade Avenue, Ste. 1
> Colorado Springs, CO 80903
> TEL (719) 475-1204
> FAX (719) 475-1264
> Email:ikalmanowitz@cornishandellolio.com
>       bsherman@cornishanddellolio.com
> Attorneys for Plaintiff

Plaintiff's address:
3405 Prestwicke Place
Colorado Springs, CO 80922